In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 25-2278

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARK RANDLE,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:20-cr-30060 — **Colleen R. Lawless,** *Judge.*

———————————

ARGUED MAY 19, 2026 — DECIDED JULY 29, 2026

———————————

Before BRENNAN, *Chief Judge,* and ST. EVE and KOLAR, *Circuit Judges.*

KOLAR, *Circuit Judge.* Police used a confidential source to set up a controlled buy of methamphetamine with Mark Randle. The next day, as Randle drove back home with the drugs in his car, police pulled him over in a pretextual traffic stop. A dog sniff and warrantless search turned up the drugs, and Randle was indicted on trafficking charges. He pled guilty and now appeals three adverse rulings by the district

court: his motion to suppress evidence from the search of his car, his motion to disclose the confidential source's identity, and his motion to produce the transcript of the grand-jury proceedings.

We affirm on all fronts. Randle's motion to suppress fails on multiple grounds, but foremost, the controlled buy gave police probable cause—irrespective of the later traffic stop and dog sniff—to search his car for drugs under the automobile exception to the Fourth Amendment's warrant requirement. And we see no abuse of discretion in the district court's other rulings: Randle failed to adequately explain his need for either the confidential source's identity or the grand-jury transcript.

## I. Background

The events leading to Randle's arrest and indictment began in August 2020, when police officer Justin Ebbing spoke with a detainee at the Sangamon County Jail who had previously served as a confidential source for law enforcement. The individual told Officer Ebbing that they had recently facilitated methamphetamine deals between Randle and a supplier. Officer Ebbing signed the individual up as a source again and had them set up a controlled buy between Randle and the supplier.

The controlled buy took place on September 3, 2020, at a Hyatt hotel just outside Chicago. Police watched the source meet Randle and Randle's girlfriend outside the hotel and walk in together. Then the source reemerged and met the supplier in the hotel's parking lot to pick up a bag. That evening, the source met with police and shared that they had taken the bag—containing methamphetamine—to Randle's hotel room.

The source gave police a sample of the methamphetamine that Randle had given them as "payment" for facilitating the deal. The source was wearing a covert recording device, but police later discovered it had failed to record any of the conversations inside the hotel.

Meanwhile, Officer Ebbing went to work on getting a GPS tracking device for Randle's car. While Officer Ebbing applied for and received a warrant for the tracker, he did not simultaneously get a warrant to search the car. He later testified that he chose not to get a warrant for the car in order to avoid putting material into an affidavit that might expose his confidential source, though he did not explain why the tracker warrant he *did* obtain avoided that concern.

The next morning, police watched Randle leave the hotel with his girlfriend and put a suitcase in the trunk of his car. The car drove off, headed southbound towards St. Louis.

Police set up a traffic stop to intercept Randle and his girlfriend. Illinois State Police troopers—all briefed on the previous evening's controlled buy—stationed themselves on the shoulder of I-55 in the Springfield area. Trooper Gray saw Randle's car first and pulled onto the highway to tail it. He later testified that he decided to pull Randle over for following less than a car length's distance away from the car in front of him, though Randle disputes that he was doing so.

After both cars pulled onto the shoulder, Trooper Gray asked Randle to sit in his squad car while he issued Randle a written warning. Randle complied. As Trooper Gray was writing up the warning, Sergeant Adams arrived and began questioning Randle's girlfriend, then Randle, about the couple's travel plans. After noting inconsistencies in their ac-

counts, Sergeant Adams asked Randle if there were any guns, drugs, or alcohol in the car and for permission to conduct a dog sniff. Randle, looking increasingly flustered, responded, "Go ahead, I don't give a damn." Footage from inside the squad car shows Trooper Gray continuing to type up the warning on his computer, at one point asking Randle for his address.

A K-9 unit arrived, and the dog alerted outside Randle's car about ten minutes after Trooper Gray made contact with Randle on the side of the highway. At that point Randle made a break for it: he bolted out of the squad car and dove for his car. Police wrestled him away from the car, but Randle broke free and took off running. Police pursued him and took him into custody. A search of the car turned up nearly three pounds of methamphetamine in the trunk.

A grand jury in the Central District of Illinois indicted Randle on one count of possession with intent to distribute methamphetamine under 21 U.S.C. § 841(a)(1) and (b)(1)(A). Randle moved to suppress the evidence recovered from his car, claiming that the police's stop and search of his car violated the Fourth Amendment. After an evidentiary hearing, the district court denied Randle's motion.

Randle then filed two additional motions, both of which the district court also denied. First, he moved to disclose the identity of the government's confidential source. Second, he moved to produce the grand-jury transcript, claiming a need to investigate alleged omissions by the government in securing the indictment. After the district court's ruling on the last motion, Randle entered a conditional guilty plea reserving the right to appeal all three denials. The district court sentenced

him to seventeen and a half years of imprisonment and ten years of supervised release. He now appeals.

## II. Discussion

We take Randle's three motions in the order they were filed, starting with his motion to suppress, then turning to his motion to disclose the confidential source, and concluding with his motion to produce the grand-jury transcript. Because we find no error in any of the district court's denials, we affirm.

### A. Motion to Suppress

Randle argues the police's traffic stop and warrantless search of his car violated the Fourth Amendment's prohibition on "unreasonable searches and seizures." U.S. Const. amend. IV. He contends that the stop was not justified by reasonable suspicion of a traffic violation, was extended beyond its mission, and that police lacked probable cause to search his car without a warrant.

The district court gave two separate reasons for denying his motion to suppress. First, it held that the traffic stop was supported by reasonable suspicion and not impermissibly prolonged. *See United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021) (*en banc*) ("To be reasonable, a traffic stop must be 'justified at its inception, and reasonably related in scope to the circumstances which justified the interference in the first place.'" (citation omitted)). And it held that the dog sniff conducted during this stop gave probable cause for the search under the Fourth Amendment's automobile exception, which "permits an officer to search a vehicle without a warrant if the search is supported by probable cause." *United States v. Davis*,

119 F.4th 500, 506 (7th Cir. 2024) (citation omitted). Second, the district court held that the automobile exception separately justified the search based on probable cause from the previous evening's controlled buy. In evaluating these holdings, we review legal conclusions *de novo* and findings of fact for clear error. *Cole*, 21 F.4th at 427.

On appeal, Randle insists not only that these two theories are each flawed, but that the government cannot rely on both simultaneously and must "pick a lane" in seeking affirmance. We reject that premise. Warrantless searches are commonly supported by multiple alternative theories. *See, e.g.*, *Davis*, 119 F.4th at 507 ("The search of [the defendant's] car was lawful, falling within both the search incident to arrest and automobile exceptions to the warrant requirement."). But while we could affirm on either (or both) of the theories the district court relied upon, we focus first on the most straightforward: the controlled buy provided probable cause to search Randle's vehicle under the automobile exception.

For over a century, the Supreme Court has authorized warrantless searches of cars and other "movable vessel[s]" based on "probable cause for believing that the[y] … are carrying contraband or illegal merchandise." *Carroll v. United States*, 267 U.S. 132, 151, 154 (1925). The *Carroll* Court grounded its decision in part on the difficulty of securing warrants for vessels that "can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." *Id.* at 153. But in the years since, the Supreme Court has made clear that *Carroll*'s automobile exception "has no separate exigency requirement." *Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (*per curiam*). While the doctrine might once have been rooted in exigency, it has long since been retheorized as a consequence

of "the individual's reduced expectation of privacy in an automobile, owing to its pervasive regulation." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (*per curiam*) (citing *California v. Carney*, 471 U.S. 386, 391–92 (1985)).

Under *Dyson* and *Labron*, it is irrelevant that—as Randle points out—the police likely "had time to secure a warrant" to search his car based on their drug investigation, and in fact *did* get a warrant to *track* the car. *Id.* at 939. All that matters is probable cause: whether, "based on the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Davis*, 119 F.4th at 506 (cleaned up).

That standard was already met for Randle's car before police ever pulled him over. In the weeks and days leading up to the controlled buy, police recorded phone calls and text messages in which Randle discussed setting up a drug transaction with the confidential source. On the day of the controlled buy, they watched Randle meet with the source at the hotel, watched the source pick up a bag from the supplier, verbally confirmed with the source that Randle had received the drugs inside the hotel, and obtained a sample of the drugs. Then the next morning, police watched Randle emerge from the hotel, place a suitcase in his car, and drive off. At that point, there was more than a fair probability that a search of the car would recover drugs or other evidence of the drug deal.

Even if this were not so, we could separately affirm the denial of the motion to suppress based on the traffic stop and dog sniff under our *en banc* decision in *United States v. Cole*. In that case, too, police pulled a suspect over for following another car too closely, questioned him while issuing him a writ-

ten warning, and conducted a dog sniff that resulted in the finding of drugs in his car. 21 F.4th at 425–27. We found these actions constitutional and affirmed the denial of the defendant's motion to suppress. *Id.* at 435.

Randle's attempts to distinguish *Cole* run headlong into our limited review of the district court's factual findings on appeal. For example, he argues Trooper Gray's alleged basis for the initial stop (following too closely) was unsupported by objective criteria. *See* 625 ILCS 5/11-710(a). But we made clear in *Cole* that both an officer's credible testimony and "the court's own review of the traffic stop footage" can establish reasonable suspicion. 21 F.4th at 428, 434 (citation omitted).

Here, the district court cited Trooper Gray's testimony, its independent review of his dash-cam video, and Randle's inconsistent statements between the traffic stop and the suppression hearing on whether he was in fact following too closely, in finding the stop justified. Since none of these factual findings are "clearly erroneous," we cannot question them on appeal. *Id.* at 434; *see United States v. Yang*, 39 F.4th 893, 899 (7th Cir. 2022) ("A factual finding is clearly erroneous only if, after considering all the evidence, we cannot avoid or ignore a 'definite and firm conviction that a mistake has been made.'" (citation omitted)). And those findings support the conclusion that Trooper Gray reasonably suspected a traffic violation.

Similarly, while Randle argues that police impermissibly departed from "the mission of a traffic stop" by questioning him about drugs in his car, *Cole* held that "an officer may ask questions unrelated to the stop, and even conduct a dog sniff, if doing so does not prolong the traffic stop." 21 F.4th at 429. The district court found from the video that Trooper Gray

continued to work on Randle's written warning while Randle was being questioned. And it found that the officers' questions did not extend the stop—lasting roughly ten minutes from when the cars pulled over—beyond the time reasonably necessary to complete its purpose. That finding, too, is not clearly erroneous based on our review of the record.[1] *Id.* at 434; *United States v. Goodwill*, 24 F.4th 612, 616 (7th Cir. 2022). Both the initial stop and subsequent events, then, were constitutional under *Cole*.

We thus conclude that the district court correctly denied Randle's motion to suppress.

### B. Motion to Disclose Confidential Source

We turn next to the district court's denial of Randle's motion to disclose the confidential source. This denial is reviewed for abuse of discretion. *United States v. Maxwell*, 143 F.4th 844, 856 (7th Cir. 2025).

The government has a "limited privilege" to withhold a confidential source's identity, which can be overcome by a showing that this information is "relevant and helpful to [the] defense or is essential to a fair determination of a cause." *Id.* (citation omitted). In applying this test, our circuit has drawn a distinction between "transactional witness[es]" who di-

---

[1] The district court also held that Randle voluntarily consented to the search by answering "Go ahead, I don't give a damn" when Sergeant Adams asked him for permission to conduct a dog sniff. We need not reach that issue: because the dog sniff was conducted during the lawful pendency of the traffic stop, Randle's consent for the sniff was unnecessary. *See United States v. Lewis*, 920 F.3d 483, 491 (7th Cir. 2019) ("It is well-established a dog sniff of a vehicle's exterior only for illegal drugs *during* a lawful stop for a traffic violation does not infringe Fourth Amendment rights, even absent reasonable suspicion of drugs.").

rectly participate in or witness the events underlying the charges and "mere tipster[s]" who provide supporting information from a distance. *Id.* (citation omitted). In general, it is easier for a defendant to meet their burden of showing a need to disclose a transactional witness than to disclose a mere tipster. *Id.*

No one disputes that the confidential source here was "transactional": the source set up and participated in the controlled buy that led to Randle's arrest. But that is not always dispositive. *Id.* The ultimate burden still rests with the defendant to show that disclosure is warranted. *United States v. Valles*, 41 F.3d 355, 358 (7th Cir. 1994).

Randle has not met that burden. Both below and on appeal, he has only attempted to justify disclosure by suggesting that the confidential source's identity might support "a possible defense of entrapment, mere presence, lack of intent, etc." without further elaboration. The government, by contrast, described the information provided to Randle in discovery—such as statements made by the confidential source that they had been involved in multiple prior drug transactions with Randle. This suggests that the source's testimony would be not only unhelpful to his defenses, but actively inculpatory. *See United States v. McDowell*, 687 F.3d 904, 911–12 (7th Cir. 2012) (affirming denial where rationale for source's disclosure was "flimsy").

We take Randle at his word that a disclosure from the government might have advantaged him somehow, and that a different decisionmaker might have ordered the source disclosed. But that is not enough to show an abuse of discretion on appeal, at least not without an explanation more precisely describing how the disclosure would help his defense. We

must affirm if "any reasonable person could agree with the district court's decision," and do so here. *Id.* at 911 (citation omitted). The district court was given nothing to support the notion that disclosure would help Randle, as opposed to simply "outing" an informant.

The district court did not abuse its discretion in denying Randle's motion to disclose the confidential source's identity.

### C. Motion to Produce Grand-Jury Transcript

Finally, we turn to Randle's motion to produce the indicting grand jury's transcript. Here, too, we review the district court's denial for abuse of discretion. *United States v. Tingle*, 880 F.3d 850, 855 (7th Cir. 2018).

Grand-jury proceedings are presumptively secret, but this presumption can be overcome by a showing of a "particularized need." *Id.* The moving party "must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." *Id.* at 855–56 (quoting *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 222 (1979)). In articulating his need below, Randle cited a belief that Officer Ebbing—the police officer who recruited the confidential source—had testified inconsistently between the grand-jury proceeding and the suppression hearing. He reiterates this belief on appeal, questioning whether Officer Ebbing fully informed the grand jury that his source had been arrested for criminal activity after previously cooperating with the government.

Even accepting that Officer Ebbing did in fact testify inconsistently—which Randle has not backed up with any evi-

dence—we still find no abuse of discretion in the district court's decision to deny Randle the grand-jury materials. For starters, the government had no duty to present exculpatory evidence to the grand jury, *United States v. Williams*, 504 U.S. 36, 52 (1992), so it is not clear how any such inconsistency would have helped Randle's case.

This aside, the district court also needed to balance any hypothetical benefit to Randle against the effect that disclosure might have "upon the functioning of future grand juries." *Douglas Oil Co.*, 441 U.S. at 222; *see United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958) ("The grand jury as a public institution serving the community might suffer if those testifying today knew that the secrecy of their testimony would be lifted tomorrow."). District courts have "broad discretion" in weighing the competing interests at stake in grand-jury disclosure, and we will not second-guess the district court's determination that they did not tilt in Randle's favor here. *Hernly v. United States*, 832 F.2d 980, 985 (7th Cir. 1987).

### III. Conclusion

For the reasons stated, we AFFIRM.